| | |
|---|---|
| **2nd Judicial District Court**<br>**Denver County, State of Colorado**<br><br>Court Address:  1437 Bannock Street<br>  Denver, CO 80202 | DATE FILED: December 22, 2023 3:29 PM<br>FILING ID: 8617A0F92F35C<br>CASE NUMBER: 2023CV33767 |
| **Plaintiffs:**   Steven Stophel and Elena Stophel<br><br>v<br><br>**Defendant:**   Liberty Mutual Personal Insurance Company | ▲   COURT USE ONLY▲ |
| **Attorneys for Plaintiff:**<br><br>Attorney:   David M. Roth #44800<br>Address:   The Roth Group<br>  950 South Cherry Street, Suite 416<br>  Denver, CO 80246<br>Phone:   (303) 662-8082<br>Fax:   (303) 662-8083<br>Email:   david@rothgrouplaw.com | Case Number:<br><br><br><br>Div. |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiffs, Steven Stophel and Elena Stophel, by and through their attorneys, The Roth Group, hereby respectfully submit the following Complaint against Liberty Mutual Personal Insurance Company:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff, Steven Stophel, (hereinafter "Plaintiff") is over the age of 18 and domiciled in Denver County in the State of Colorado.

2. Plaintiff, Elena Stophel, (hereinafter "Plaintiff") is over the age of 18 and domiciled in Denver County in the State of Colorado.

3. Upon information and belief, Defendant, Liberty Mutual Insurance Company (hereinafter "Defendant"), is a foreign corporation organized under the laws of Florida, authorized to do business in the State of Colorado, is in good standing, and is engaged in the business of insurance within the state by, among other things, insuring Plaintiff's property.

EXHIBIT
A

4. This Court has jurisdiction over the subject matter of this action and the parties hereto.

5. Venue is proper in this Court pursuant to C.R.C.P. 98(c)(1).

## GENERAL ALLEGATIONS

6. Plaintiff is the owner of real property and improvements located at 765 Jasmine Street, Denver, CO 80220 (hereinafter "Property").

7. Defendant issued the Plaintiff Policy Number H3V-298353067-4028 (hereinafter "Policy"), insuring the Property.

8. The Policy was in effect during the period in which the subject loss occurred.

9. The insurance policy covers all risks of sudden and accidental direct physical loss or damage to the Property, including damage as a result of water damage.

10. On or about December 22, 2021, a water filter, next to the kitchen sink at Plaintiff's Property filled with water and overflowed, causing water damage to the surrounding area which then leaked into the basement of the Property. Approximately 60-80 gallons of water was leaked into and through the kitchen floor

11. Plaintiff filed a claim with Defendant and Defendant assigned claim number 047962445 (hereinafter "Claim").

12. On or about December 23, 2021, adjuster for Defendant, Michael Zeldin, sent an email to Plaintiff informing him that they were working directly with Paul Davis Restoration, Inc. (hereinafter "Paul Davis") for the water removal, damage mitigation and removal process.

13. Plaintiffs selected Paul Davis as their contractor at the recommendation of Defendant and understanding that Paul Davis was a member of a preferred contractor network of Defendant's.

14. Once Paul Davis was finished with the water removal process, Mr. Zeldin conducted an inspection of the Property.

15. During that inspection, Ms. Zeldin informed Plaintiff Steven Stophel that he was trying to estimate the damage for approximately $10,000 so he could provide payment to Plaintiffs without any additional approval.

16. Defendant issued a payment of $10,015.54 to Plaintiffs on January 11, 2022.

17. Defendant's initial estimate failed to account for the substantial damage to the Property and missed several key components including but not limited to, the kitchen cabinets removal and repair, furniture moveout costs, relocation, etc.

18. On or about February 16, 2022, Paul Davis provided a mitigation completion certificate, which stated that during the process of their mitigation, damage to the floors was caused:

    **"The kitchen floor and and subfloor was dried from underneath and I am not aware of any mold prevention solutions being applied. Also the team disassembled furniture and moved furniture, but did not reinstalled the furnishings. The toe kicks were removed and the kitchen cabinets were dried with fans on the main floor. Also the drying from below was damaging to the floor and in several areas of the home cracks appeared that will need to be repaired. When the demo team came they left equipment behind for a week or so."**

19. Paul Davis emailed Plaintiffs on or about April 5, 2022, stating that they were moving forward with pushing their claim over to production for planning, also attaching a work authorization for review and signature.

20. On or about April 16, 2022, Plaintiffs emailed Paul Davis edits to the work agreement, especially regarding the need to see the estimate referred to in the work agreement, additions and deletions to the work agreement, supplemental orders and change orders being directed to Plaintiffs and Liberty Mutual for cover as well as any billing.

21. Further Plaintiff highlighted that all materials should be at the same quality or greater than originally used in construction our property, including the paint used, as well as stating Paul Davis's liability without limit for "losses of property, damage, etc; accidents, injury and death; environmental claims and damage".

22. On or about April 22, 2022, Paul Davis sent a revised work agreement as well as an estimate, with an open line item for cabinetry; Paul Davis additionally mentioned that the moving estimate would need to be revised as they were getting the Colorado Art Restoration involved to move the highly valued artwork in the home.

23. After the appropriate changes had been made, on or about June 11, 2022, Paul Davis emailed Plaintiff with a revised work authorization to review and sign. In addition an estimate totaling in $14,984.56 was provided but again did not include many items that were explained to Plaintiffs would be accounted by change orders.

24. Plaintiffs would copy Mr. Zeldin on all communications with Paul Davis regarding the work authorization and if Plaintiffs needed, would escalate any concerns that had regarding Paul Davis to seek Mr. Zeldin's assistance.

25. Mr. Zeldin would regularly assist the Plaintiffs in communicating with Paul Davis regarding the work authorization.

26. Plaintiff signed this on or about June 13, 2022, and emailed this back to Paul Davis on or about June 27, 2022.

27. On or about August 17, 2022, Paul Davis reached out to Plaintiffs to schedule a meeting regarding the beginning of the repair work.

28. After this meeting took place, on or about September 7, 2022, Paul Davis emailed Plaintiffs stating that due to their current workload, work will likely not be able to commence until 2023.

29. On or about September 8, 2022, Plaintiff inquired as to why this was taking more than 9 months to complete as well as requesting all documentation for his files, including quotes from vendors and all work already completed. No documentation was provided to Plaintiffs.

30. The additional repair and restoration work would not be completed by Paul Davis.

31. Plaintiffs reached out to Mike Zeldin on or about September 13, 2022, to discuss how to move forward, as nearly a year has passed since the date of loss, and their Property was not yet restored to its pre-incident condition. Mr. Zeldin put Plaintiffs in touch with another preferred vendor, Bella.

32. Also around this time, there was no indication from Defendant that there would be an issue with not covering Plaintiffs' additional living expenses even though it was clear the Plaintiffs would need to vacate the Property.

33. On or about October 20, 2022, Plaintiffs reached out to Bella Restoration Services ("Bella"), requesting they provide a quote, based on the work completed by Paul Davis, which Bella provided the same day.

34. Plaintiffs sent an email to Bella on or about March 18, 2023, requesting that any estimates and proposed work be sent in order to execute contracts in order to get a date when the work would be completed.

35. This work included vendors for the countertop, cabinets, floors, moving furniture and removal and installation of the vanity and toilet in the bathroom.

36. Additionally, Plaintiffs requested assistance from Zeldin on finding vendors for sheetrock repair, baseboard removal/replacement, repair/removal and installation of the banister on the main level.

37. As of April 11, 2023, Plaintiffs informed Mike Zeldin that they had not received a response from Bella, and thus decided to move forward with completing the necessary work through separate vendors.

38. On or about April 11, 2023, Mike Zeldin responded stating that he would be in touch tomorrow afternoon to discuss the Claim.

39. Plaintiffs sent Mike Zeldin the costs of moving and storage associated with the restoration construction on or about April 24, 2023. In response, Plaintiffs received a response that Mr. Zeldin was no longer with Liberty Mutual.

40. Plaintiffs were not reassigned to a new adjuster until they reached out to Liberty Mutual and a claims manager, Bob Hall, indicated he would assign a new adjuster.

41. On or about May 17, 2023, Plaintiffs received an email that their Claim was reassigned to adjuster Mr. Waldynski.

42. In this same email, Mr. Waldynski informed Plaintiffs that they received confirmation that a company accepted the task of inspecting the cabinetry.

43. Plaintiffs were in Europe at the time this email was sent, and responded on or about June 30, 2023 confirming that the cabinetry work was approved, as well as inquiring about the moving/storage approval.

44. Plaintiffs followed up on this email on July 6, 2023, and on or about July 7, 2023, Mr. Waldynski email stating that the moving/storage was approved, and the cabinetry had additionally been submitted for approval; he further discussed the Loss of Use coverage in the Policy.

45. On our about July 9, 2023, Plaintiffs responded to the company organizing the repairing of their cabinetry, detailing that the damage caused by Paul Davis included the toe kicks and dishwasher toe kick & insulation, as well as all of the cabinets and the island toe kicks and the granite countertop also being damaged (separated at the seams) after being dropped on a cabinet.

46. In response, Plaintiffs sent an email on or about July 13, 2023 detailing the progression of their Claim from the beginning; including details of how Defendant's preferred vendors (Paul Davis and Bella) were unreliable and unable to successfully complete the work in a timely manner, as well as having caused significant damage to the Plaintiffs Property in the process of their remediation repairs.

47. Additionally, Plaintiffs highlighted that it had been almost two years since the date of loss, and the necessary repairs to their Property had not been completed;

further stating that they are now at risk for non-coverage as a result of going through non-preferred vendors.

48. On or about August 01, 2023, Liberty Mutual provided an additional supplemental estimate, totaling $23,394.71.

49. Defendant issued an additional payment to Plaintiffs on or about August 2, 2023, totaling $10,906.41.

50. Plaintiffs responded to Defendant on or about August 4, 2023 stating that the estimate provided was not indicative of the actual cost of repairs.

51. Plaintiffs continue to await approvals for quoted work.

52. Plaintiffs continue to be unable to restore their Property to its pre-incident condition, limiting their use of the Property.

53. Plaintiffs have incurred costs in excess of approximately $100,000 and have not been fully reimbursed by Defendant according to the Policy.

54. Throughout the claims process, Plaintiffs would regularly seek assistance and clarification from Defendant, only to receive no or extremely delayed responses.

55. Defendant has not provided a reasonable basis for the undue delay of the payment of benefits according to the Policy.

56. Defendant has unfairly and unreasonably handled the claim, through their lack of involvement with the preferred vendors, and in failing to aid the Plaintiffs in finding a timely solution to repair the damage to the Property.

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

57. Plaintiff incorporates the foregoing paragraphs of his Complaint as if fully set forth herein.

58. The Policy creates a contract of insurance.

59. By its actions, though not fully paying Plaintiff's claims under the Policy, Defendant breached the contract of insurance.

60. As a direct and proximate result of said breach, Plaintiff is entitled to damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION

**(Bad Faith Breach of Insurance Contract)**

61. Plaintiff incorporates the foregoing paragraphs of his Complaint as if fully set forth herein.

62. Defendant owed duties to Plaintiff under the Policy's implied covenant of good faith and fair dealing, wherein it covenanted that it would, in good faith, and in the exercise of fair dealing, deal with Plaintiffs fairly and honestly, faithfully perform its duties of representation, and do nothing to impair, interfere with, hinder or potentially injure Plaintiffs' rights to receive the Policy's benefits.

63. Defendant acted unreasonably and breached its duties of good faith and fair dealing by its actions, which included, without limitation, the following unreasonable acts:
    a. Failing to properly investigate and evaluate Plaintiff's claim for Policy benefits;
    b. Failing to consider all available information when evaluating Plaintiff's claim for insurance benefits;
    c. Failing to provide Plaintiff with a reasonable explanation of its claims handling decisions;
    d. Failing to pay amounts due to Plaintiff under the Policy in a timely manner;
    e. Failing to effectuate a prompt, fair, and equitable settlement of Plaintiff's claims;
    f. Failure to give equal consideration to Plaintiff's rights and interests as it has given its own interests;
    g. Depriving Plaintiff of the benefits and protections of the contract of insurance; and
    h. Other conduct to be revealed through discovery.

64. As a result of this willful, wanton and reckless conduct, Plaintiff has directly and proximately suffered damages as set forth more fully in their prayer for relief below.

### THIRD CAUSE OF ACTION
**(Violation of C.R.S. §10-3-1115 and Relief Pursuant to §10-3-1116)**

65. Plaintiff incorporates the foregoing paragraphs of his Complaint as if fully set forth herein.

66. C.R.S. §10-3-1115 forbids an insurer from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

67. Plaintiffs are first-party claimants under C.R.S. §10-3-1115.

68. Defendant has improperly denied or delayed resolution of Plaintiffs' claim without a reasonable basis within the meaning of C.R.S. §10-3-1115.

69. C.R.S. §10-3-1116 provides that a first-party claimant whose claim has been unreasonably delayed or denied by an insurer may bring an action in Colorado district

  court to recover reasonable attorneys' fees and court costs and two times the covered benefit.

70. Due to Defendant's actions and conduct as set forth herein in violation of C.R.S. §10-3-1115, Plaintiffs brings this claim to recover their reasonable attorneys' fees, court costs and, two times the covered benefit, as allowable under C.R.S. §10-3-1116.

WHEREFORE, Plaintiffs Steven Stophel and Elena Stophel respectfully request that judgment be entered in their favor and against Defendant Liberty Mutual Personal Insurance Company as follows:

  a) For compensatory damages, both economic and non-economic, in amounts to be proved at trial;
  b) For double damages pursuant to statute;
  c) For all prejudgment interest, statutory or moratory, and post-judgment interest allowed by law;
  d) For reasonable attorneys' fees and costs of suit herein; and
  e) For such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated this 22nd day of December 2023.

        Respectfully Submitted,
        THE ROTH GROUP

        */s/ David M. Roth*
        David M. Roth, #44800

        ATTORNEY FOR PLAINTIFFS

        *In accordance with C.R.C.P. 121, §1-26(9), a printed copy of this document with original signatures is being maintained by the filing party and will be made available for inspection by other parties or the Court upon request*